UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
_____

Ashley Wells, Stephanie Mostowski
And Alicia Banducci,

       File No. _____

    Plaintiffs,

v.

       **COMPLAINT**

Envoy Medical, Inc.

    Defendant.

       **DEMAND FOR JURY TRIAL**
_____

**PRELIMINARY STATEMENT**

1.    Plaintiffs bring this action against Defendant for hostile environment sexual harassment, sexual discrimination and reprisal under the Minnesota Human Rights Act and the Minnesota Whistleblower statute.

**JURISDICTION AND VENUE**

2.    This Court has jurisdiction over Plaintiffs' claims on the basis of diversity pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

3.    Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events and omissions giving rise to the claim occurred in Minnesota, and because Defendant Envoy is located in Minnesota.

## THE PARTIES

4. Plaintiff Ashley Wells began working for Envoy in July 2010 as a Field Clinical Engineer ("FCE"). Wells lives in Saratoga Springs, New York.

5. Plaintiff Stephanie Mostowski began working for Envoy in November 2010 as an FCE. Mostowski lives in Chicago, Illinois.

6. Plaintiff Alicia Banducci worked for Envoy as an FCE for three weeks in March 2011. Banducci lives in Athens, Georgia.

7. Defendant Envoy Medical is a Minnesota corporation with its principle place of business at 5000 Township Parkway in St Paul. Envoy manufactures and sells implantable hearing restoration devices.

## FACTUAL ALLEGATIONS

**A.   Harassment of and Retaliation against Ashley Wells**

8. New FCEs at Envoy are expected to complete a variety of different training activities and achieve certain milestones. Both their compensation and future assignments are directly linked to completing these trainings. Thus, the number of fittings and operations to which they are assigned is critically important to their advancement at the company.

9. As part of her job duties, in November 2010 Wells was directed to provide laboratory training to Mostowski and another recent Envoy FCE hire, Robert Brown, in Greensboro, North Carolina.

10. At various times during their training in November, Brown sexually harassed Wells. This harassment included unwanted touching and comments, as well as inappropriate inquiries into her personal life.

11. In mid-December 2010, Wells approached Melinda Marthaler, Envoy's Lead FCE and her direct supervisor, to discuss Brown's inappropriate behavior. Wells informed Marthaler that, because of Brown's conduct, her work environment was intolerable, and that the situation must be addressed before she was required to work alone with Brown again. Marthaler assured Wells that she would handle her complaint about Brown, but she never responded to Wells.

12. On January 9, Wells told Mostowski about Brown's harassment. In response, Mostowski told Wells that Brown had already learned of her complaint from Jay Courant, another FCE. Courant told Brown that Wells was "obviously making it up" and lying about Brown's conduct, and that as a result of her complaint, Wells was alienating herself from the FCE group. Courant also insinuated that Wells would not be assigned to any more surgeries.

13. In January, 2011, Brown received a $10,000 pay increase despite Wells' complaint about his behavior the previous month.

14. On January 17, 2011, Wells sent Marthaler an e-mail asking how her complaint about Brown had been handled as she was scheduled to return to Greensboro to spend several days with him in the training lab. Marthaler had apparently not taken any action in response to Wells' report the previous month; she responded the next day

that "Lisa [Rautenberg] from HR is going to talk with you about the situation and she is going to handle it from here."

15. Wells then approached Rautenberg to discuss Brown's inappropriate conduct. Wells reported that Brown had touched her lower back and waist inappropriately, and that several times he had followed her into an empty conference room and put his hands on her. Wells also described inappropriate text messages and late-night phone calls to her hotel room. Rautenberg assured Wells that the situation would be dealt with professionally.

16. A short time later, Wells returned to Rautenberg's office to express her concern over how Marthaler had responded to her initial complaint in December. She told Rautenberg that Marthaler had apparently told Courant about her complaint, and that Courant then shared that information with Brown. Wells told Rautenberg that Courant had suggested that Wells was lying about her complaint, even though Envoy had not conducted any investigation into it.

17. During this meeting, Rautenberg asked Wells whether Brown was behaving in this fashion towards anyone else. Wells indicated that he was, but that she did not want to speak for anyone else. Rautenberg then told Wells to have Mostowski call her, even though Wells never mentioned Mostowski's name.

18. On January 19, 2011, Wells sent an e-mail to Envoy's General Counsel, Brent Lucas, raising concerns that Marthaler was assigning her tasks which conflicted with instructions she received from other Envoy managers, and which were not in her best interests or those of the company. Lucas responded briefly that same day,

indicating that he appreciated her concerns and would do all that he could to make sure she was treated fairly and appropriately.

19. Wells met directly with Lucas on January 21. She reiterated her concerns about Marthaler's work assignments, and her fear of retaliation for not complying with Marthaler's direction. She also told him of her earlier complaints to Marthaler about Brown. Lucas told Wells that he understood why she would be uncomfortable working in the lab with Brown when her complaints about his behavior had not been addressed properly.

20. On January 28, Wells learned that she had not been scheduled for any surgeries the following week, negatively impacting her training and ability to progress within the company.

21. On February 10, 2011, Wells received an e-mail that Marthaler had sent at 1:00 a.m. that morning. Marthaler indicated that a surgery team had advised Envoy that Wells' work on January 13, 2011 had not been "ideal", and that as a result Marthaler was removing Wells from the surgery schedule. She also removed Wells from a fitting training, an important role for FCEs to learn. Wells received this e-mail as she was preparing to fly to Minnesota for a surgeon training that she had been scheduled to lead.

22. Wells immediately responded to Marthaler's e-mail by requesting the specifics of the complaints about her, as she recalled that the surgery on that day had gone well. Marthaler related specific comments supposedly received from the surgeon, Dr. Shohet; the anesthesiologist, Dr. Vigil; and two nurses, Sharon and Lisa. Marthaler

5

specifically quoted Dr. Vigil as stating that he was "not comfortable" when Wells was in the operating room.

23.     Wells contacted Dr. Vigil directly. He assured her that he had not complained about her performance in surgery, and that he did not believe that Dr. Shohet had any concerns about her either. Dr. Vigil later followed up with an e-mail to Wells stating:

> As far as feedback from the 1/13 case (or any other case I have observed your performance), I have only positive comments. I have always observed you to be prompt, courteous, professional and competent. I am very comfortable having you in attendance for our Envoy cases. You are a pleasure to work with. Let me know if I can be of any assistance.

24.     On February 11, Wells initiated a meeting with General Counsel Lucas and Human Resources Director Rautenberg to discuss Marthaler's e-mail about Dr. Shohet's surgery. Wells told them about Dr. Vigil's positive comments, and that the surgery report that day confirmed that neither Sharon nor Lisa had attended the surgery. Wells asked Lucas to arrange a conference call with Drs. Shohet and Vigil to discuss Wells' performance in surgery. Lucas stated that he did not want to involve the surgeons.

25.     For the week of February 14, Wells was again left off the surgery schedule.

26.     On February 21, 2011, Rautenberg encouraged Wells to speak with Shelly Amann, Envoy's President, about the issues she had been experiencing. Wells spoke with Amann by phone that same evening. Wells detailed Brown's harassing conduct, her complaint to Marthaler, Marthaler's failure to investigate her concerns, and Marthaler's subsequent retaliation against her, including her invention of a complaint about her by

6

Drs. Shohet and Vigil and her removal from the surgery schedule. Wells also forwarded Dr. Vigil's complimentary e-mail to Amann.

27. On February 27, Amann sent an e-mail to Wells asking her to "briefly outline" her situation so that she could "help her out". Amann also mentioned that Wells' information would be confidential and not shared. Amann concluded her e-mail by writing: "Woman to woman, I can understand some of the frustrations you discussed on the phone and believe we have to make sure any negative HR or training related items, should they occur, need to be handled appropriately."

28. On March 1, Wells responded to Amann's invitation by describing issues regarding training and her sexual harassment complaint about Brown. She wrote:

> And, yes, unfortunately what it seems like to me is that ever since I put in a sexual harassment complaint, all of these things have come to light. Woman to woman, it is discouraging. I have been treated as though I was blowing something out of proportion, or even lying about it. I was being touched, my hotel room was called at inappropriate hours and inappropriate texts were sent to me. There were also comments made that were unprofessional. I thought that I could go to my higher up with this concern and that it would be handled appropriately. * * * The situation was handled very poorly, and since then, I have had little to no contact with anyone in the FCE group except for Stephanie.

29. Amann responded to Wells in a lengthy e-mail on March 4. Amann began her e-mail by suggesting that Wells had "misunderstood" her. She ended her e-mail as follows:

> It seems apparent to me that you're unhappy with your job, the company and maybe even bitter, based upon our conversations and emails. If you're not interested in pursuing how to move forward with Envoy, perhaps we should discuss alternatives.

7

30. Wells assured Amann that same day that she wanted to "move forward" with the company, and that she had gone so far as to schedule her own trainings since Marthaler was not doing so.

31. Amann did not respond to Wells' e-mail. Instead, on March 11, 2011, she informed Wells that "due to their recent e-mail exchange", her employment with Envoy had been terminated.

32. During her employment with Envoy, Wells had received three "merit" increases, and had never received any verbal or written warnings for her performance.

**B.     Harassment and Retaliation against Stephanie Mostowski**

33. Brown sexually harassed Mostowski during their training in Greensboro in November 2010. This harassment included unwanted touching and comments, as well as inappropriate inquiries about her personal life. For instance, Brown would walk Mostowski to her hotel room door, hug her, and tell her he could come to his room for "TLC".

34. In December 2010, Brown made several inappropriate comments to Mostowski about how "good" she looked in a suit.

35. On January 14 and 15, 2011, Brown made inappropriate comments to Mostowski during a training in Minneapolis. For example, Brown pulled at the end of her latex glove and smirked to imply that the glove was a condom. When Mostowski suggested to Brown that he should stop this behavior, he responded: "You know I'm never going to stop." He also repeatedly touched her on the small of her back, placed his hand on her thigh while they were driving together on company business, and called her

"Mammy" and "Fine Ass Stephanie." Brown continued this behavior despite Mostowski's frequent requests that he stop.

36. On January 18, 2011, Rautenberg contacted Mostowski and indicated that Wells had suggested that Mostowski had also been harassed by Brown. Mostowski then related all of Brown's harassing conduct against her to Rautenberg.

37. On February 11, Mostowski contacted both Lucas and Rautenberg and described the harassment she had experienced from Brown and her concerns about deficiencies in her training. Later that day, Lucas sent an e-mail to Wells and Mostowski suggesting that they "may not be getting the materials [they] need to learn, and eventually master, the FCE role." Marthaler was not copied on Lucas' e-mail.

38. On February 21, Mostowski sent an e-mail to Lucas and Rautenberg indicating:

> According to the [schedule for the] month of March, I am working 3 days. I started my training on the same day as my co-worker, Robert Brown, who is scheduled for 13 days in March. I can only hope that the schedule for March is not complete because at this rate, my salary will never change because I will never complete any milestones. It is 4:30am and I can't sleep because I feel sick to my stomach to think that I may have made a mistake coming forward about being sexually harassed and being touched inappropriately by a co-worker. I hope that in no way this schedule is a reflection of this because truthfully if it is, I don't know if I will be able to continue with this company.

39. Lucas responded to Mostowski's e-mail assuring her that the company was working on addressing the situation but that it might take "a couple of months" to do so.

40. On February 27, Amann e-mailed Mostowski asking about her training. Mostowski responded that she lacked "practical, live training" and that her training had been miserable because she had been sexually harassed and touched inappropriately by

9

Brown, and that she had feared coming forward because she had seen the way Wells had been treated after she reported Brown's harassment.

41. Amann never responded to Mostowski's e-mail. However, several days later Mostowski received a series of e-mails from her direct supervisor, Melinda Marthaler, blaming Mostowski herself for any failures in her training and accusing her of making excuses.

42. On March 30, Marthaler told Mostowski that she was being taken off the schedule for a training session the next day. Mostowski was not scheduled for any activities during the month of April. When Mostowski e-mailed Marthaler to ask why she was not on the schedule, Marthaler never responded.

43. That same day, Mostowski e-mailed Rautenberg in HR and stated: "I fear that my complaints to HR regarding being sexually harassed by Robert Brown are linked to my absence from the schedule and I hope this is not the case." Rautenberg never responded to this e-mail.

44. On April 13, Marthaler e-mailed Mostowski and directed her to pack and move the bone laboratory in North Carolina, an activity which is clearly not in her job description or training requirements. Mostowski nonetheless complied with this request. Lucas later referred to the move as "poorly planned and poorly scheduled".

45. Although Mostowski remains an employee of Envoy, she has not been assigned to any trainings or other substantive work for weeks. Since making her complaints, she has worked a total of two days in March 2011; two days packing the lab in April; one day in May and no days in June, 2011.

**C.     Harassment and Retaliation against Banducci**

46.     Banducci began working as an FCE for Envoy on March 7, 2011. Her first assignment for the company required training with Robert Brown in Greensboro, North Carolina. Banducci and Brown were assigned by Envoy to stay in the same hotel.

47.     During her first two weeks of training, Brown made a number of inappropriate remarks to Banducci, including that she "smelled good", and that her husband was "a lucky guy." Banducci told Brown that she did not like these comments.

48.     On or about March 21, 2011, Banducci agreed to pick up some items for Brown during a trip to a grocery store. Among the items that Brown requested was a bottle of wine; when Banducci asked him what type of wine he wanted, Brown replied: "Whatever kind you like."

49.     When Banducci returned to the hotel, the desk clerk told her that Brown wanted her to bring the wine to his room. Banducci refused and insisted that Brown meet her in the lobby.

50.     When Brown came to the lobby to meet Banducci, he greeted her with a long and awkward hug.

51.     Later that same evening, Brown sent a text message to Banducci asking what she was doing. When she replied that she was in her room watching television, Brown suggested that she come to his room to get some "TLC". Banducci refused this overture.

52.     That same evening, Brown gave a poor review of Banducci's performance to Marthaler.

11

53. The next day, Marthaler advised Banducci that her employment with Envoy was being terminated because she was "not a good fit".

54. When Brown learned of Banducci's termination, he insisted on rubbing her shoulders for an extended period of time.

### FIRST CAUSE OF ACTION: MHRA SEX DISCRIMINATION

55. Envoy is an employer as defined by the Minnesota Human Rights Act, Minn. Stat. §§ 363.01 et seq. ("MHRA").

56. Wells, Mostowski and Banducci are employees as defined by the MHRA.

57. Wells, Mostowski and Banducci were subject to unwelcome harassment and a hostile work environment based on their sex.

58. The harassment was sufficiently severe and pervasive that it affected the terms, conditions and privileges of their employment and created an abusive working environment.

59. Envoy knew of the harassment and failed to take timely and appropriate remedial action.

60. As such, Envoy engaged in unfair practices against Wells, Mostowski and Banducci based on their status as women.

### SECOND CAUSE OF ACTION: MHRA REPRISAL

61. Wells and Mostowski engaged in statutorily-protected activity when they reported Brown's sexual harassment of them.

62. Banducci engaged in statutorily-protected activity when she declined Brown's various overtures.

63. Envoy took adverse action against Wells and Mostowski by, inter alia, limiting their training opportunities, discharging Wells and constructively discharging Mostowski.

64. Envoy took adverse actions against Banducci by discharging her immediately after she rejected Brown's overtures.

65. As detailed above, Envoy intimidated, retaliated and harassed Wells, Mostowski and Banducci as a result of their protected conduct.

### THIRD CAUSE OF ACTION: WHISTLEBLOWER STATUTE

66. Wells and Mostowski, in good faith, reported a violation or suspected violation of federal and state law to Envoy when they complained about Brown's harassment and Envoy's subsequent failure to investigate and removal of their training opportunities.

67. Envoy discriminated against and discharged Wells and Mostowski because of their reports.

68. Envoy's actions against Wells and Mostowski constitute a violation of Minn. Stat. § 181.932.

**WHEREFORE,** Plaintiffs Wells, Mostowski and Banducci seek the following relief:

1. A trial by jury on all their claims;

2. A finding that Envoy engaged in unfair discriminatory practices against them;

3. Compensatory damages in an amount up to three times the actual damages sustained;

4. An equitable award of front pay or reinstatement;

5. Damages for mental anguish and suffering;

6. Punitive damages because Envoy's actions were taken with malice and reckless indifference to Wells' and Mostowski's rights;

7. A civil penalty; and

8. Reasonable attorney's fees and costs.

Dated:  June 13, 2011                                          s/Thomas J. Conley
                                                                                 Thomas J. Conley (MN # 201625)
                                                                                 Law Office of Thomas J. Conley
                                                                                 900 IDS Center, 80 S. Eighth St.
                                                                                 Minneapolis, MN  55402-8773
                                                                                 (612) 455-4556
                                                                                 tj@tjconleylaw.com